ERIE R. CO. v. HANNA.

(Circuit Court of Appeals, Third Circuit. June 17, 1910.)

No. 23.

RAILROADS (§ 350*)—ACCIDENTS AT CROSSINGS—NEGLIGENCE AND CONTRIBUTORY NEGLIGENCE—WHEN QUESTIONS FOR JURY.

Plaintiff was struck and injured by a train while driving over a grade crossing on defendant's railroad at night. He and two other witnesses, who stated they were paying particular attention, testified directly that the train gave no signal for the crossing by either bell or whistle. The track to within 300 feet of the crossing ran through a cut from 1,200 to 1,500 feet long, which hid it from the view of a person on the highway. The train which struck plaintiff was a fast freight running downgrade very quietly at a speed of from 50 to 70 miles an hour. Plaintiff stopped and looked and listened by a tree 100 feet from the crossing, which was the usual place, because from there the road ran down a grade to the crossing and the view of the track was more or less obstructed all the way. He did not see nor hear the train, and drove onto the crossing without again stopping, but continued to look and listen. *Held* that, on such evidence, the questions of defendant's negligence and plaintiff's contributory negligence were both properly submitted to the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152–1192; Dec. Dig. § 350.*]

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

Action by George Hanna against the Erie Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

George F. Davenport, for plaintiff in error.

Eugene Mackey and Frank J. Thomas, for defendant in error

Before BUFFINGTON and LANNING, Circuit Judges, and ARCHBALD, District Judge.

BUFFINGTON, Circuit Judge. In the court below George Hanna sued the Erie Railroad Company, and recovered a verdict against it

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for injuries suffered by him when struck by its train. Judgment was entered on the verdict, whereupon the railroad sued out this writ, and assigned for error the refusal of its point asking for binding instructions. Two questions arise therefrom: First, was there evidence of defendant's negligence to submit to the jury? And, second, were the facts such as convicted the plaintiff of contributory negligence?

The railroad's alleged negligence consisted in failing to give warning of the approach of its train to the public road crossing where plaintiff was injured. The train in question was a midnight, high-speed, freight running very quietly downgrade and at from 50 to 70 miles an hour. The track to within 300 feet of the crossing led through a cut which was from 1,200 to 1,500 feet long and hid it from a person approaching the crossing. Witnesses testified no crossing whistle was blown, and their evidence rose higher than the mere negative proof of persons who simply did not observe. For reasons stated by them they were closely observing the whistlings made at this crossing. The plaintiff's accident occurred on June 12, 1906. A fatal accident had occurred at this crossing, which was in a rural neighborhood, in April preceding, and Mr. Davis, who lived some 35 rods from the crossing, and his wife, who had seen a neighbor killed in such accident, said they had since then been paying attention to the trains as they passed the crossing. Mr. Davis was lying awake in bed when he heard the train about half a mile beyond. His testimony was:

"Q. Mr. Davis, do you remember the night of June 12, 1906? A. I do. Q. Where were you that night? A. I was at home in bed. Q. Were you awake about midnight? A. I was. Q. State if you heard anything at that time. A. Yes, sir; I heard a train; made a peculiar noise, which drawed my attention at first, and I listened particularly to hear what it was, and I found it was a passing train and she must have been up about the water tank when I first heard it, probably a half a mile above me, and I listened particularly. Q. Is the water tank north or south of the whistling post? A. It's north of the public highway. Q. Well, is it north or south of the whistling post? A. It is north. Q. And away north? A. Yes. Q. Go on and tell what you heard. A. And I finally made up my mind that it was a fast train, and I listened to it particularly, and it shot across the crossing very rapidly, and was running fast and still. Q. About how was it running with reference to speed? A. Well, in my judgment, living there as long as I have, I would say it was running in the neighborhood of 60 or 70 miles an hour. Q. State, Mr. Davis if you gave any attention to the train at that time. A. I did. Q. Did you notice as to whether it gave any signals at the crossing? A. I did. Q. What, if any signals did it give? A. It did not give any. Q. Did you have any particular reason for noting as to whether there were signals given? A. I did. There was an accident on that same crossing in April, and ever after that I was paying particular attention to the trains when I heard them. Q. About what time did that train pass there? A. It passed there about 12 or 12:05. Q. What do you say as to whether that train sounded a whistle or rang a bell? A. I say it did not."

Mrs. Davis, who was with him, testified to the same effect, viz.:

"Q. Do you remember the night when Mr. Hanna was injured? A. Yes, sir. Q. Where were you that night? A. I was home in bed. Q. About what time of night was it? A. Well, I thing it was about 12 o'clock at night. Q. Did you hear anything? A. Why, yes; I heard the train coming down. Q. Just tell the court and jury what you heard. A. Why, I heard it just coming down

the track, making a creaking noise like a train will, and just passing the crossing without giving any warning. Q. Did you hear a bell rung? A. No, sir; I did not. Q. Did they blow a whistle? A. No, sir; they did not. Q. State whether or not you were paying any attention to the train? A. I was paying close attention to the train. I saw Mrs. Calvin killed, saw her struck, and after that I paid strict attention; and they did not whistle that night as I heard."

When the engine passed the crossing the fireman was not in his cab seat, but was sitting on the chain between the tank and the engine. His foot, which was hooked around the grab iron, was struck by something, and he went forward to investigate, and found a brakeman in his cab seat, and he subsequently made statements from which the jury could infer the brakeman was asleep. Whether the brakeman had any duty on the engine was not disclosed; the engineer simply testifying "there is supposed to be a brakeman on" the engine. The fireman went out on the pilot and found parts of the harness of Hanna's horse. This was the first knowledge the engine people had that an accident had occurred. The fireman was asked about signals:

"Q. Mr. Walters, did you hear the whistle? A. I couldn't say about a whistle. Q. Did you hear the bell? A. I did not hear the bell. Q. You did not? A. No, sir; I won't say it wasn't ringing, though."

There was also the negative testimony of the plaintiff's wife, who lived near the crossing and heard the train, that neither bell nor whistle was sounded. In addition to this the plaintiff testified to his stopping, looking, and listening, and thereafter continuing to do so as he approached the crossing, and that no signal was given. In view of this testimony from one person who was intent on listening for the train, and of two others who give a very likely reason why their attention was particularly directed to the giving of signals, we think the court below would have been in error, had it refused to submit to the jury to determine whether a crossing signal was given.

We next turn to the question of the plaintiff's alleged contributory negligence. He was driving a single-horse top buggy, with a new buggy fastened on behind. As we have seen, the railroad ran for some 1,200 to 1,500 feet through a cut which hid it from view as one approached the crossing. There was an apple tree along the road about 100 feet from the track, and this by the proofs was the best and usual place for travelers to stop. But this vantage point only gave a view to where a train emerged from the cut. From the apple tree to the crossing the view of the track for 300 feet was obscured as the traveler approached by elm bushes along the right of way, then by telegraph poles, and then by tall cat tails on the right of way, and from the property line down to the track by an 8-inch board along the top of a wire, cattle-guard crossing fence. This fence was on an embankment, and the board was thus from 7 to 8 feet above the road. Moreover, from the apple tree to the right of way the road was below the level of an embankment on top of which was a rail fence. Now, the plaintiff having stopped at the usual place at the apple tree, and looked and listened both then and as he went forward, the question whether due care called on him to again stop, in the absence of any warning from the train, was one for the jury. He

had a right to rely on the trainmen doing their duty and whistling in time for the crossing. He had two buggies to handle, and the road approached the crossing at a down grade. There was no place between the apple tree and the telegraph poles where he could get any wider view. Did due care require him to again stop as he approached the track, when the elm bushes, the telegraph poles, the cat tails, and the wide board at the top of the cattle fence more or less obstructed his view, or would due care lead him in the absence of signals, to push forward across the track? We cannot, as a matter of either law or fact, say that the latter was not the more prudent course. Indeed, it would seem he would have passed the track in safety had not his horse shied. But he was on the track before the train emerged from the cut, only 300 feet away. Running as it did, it covered that distance in three or four seconds. While the case is not on all fours with Whitman v. Pennsylvania R. R., 156 Pa. 177, 27 Atl. 291, yet what Chief Justice Mitchell says in that case is so pertinent that we repeat it, in extenso, here:

"The learned judge nonsuited the plaintiff for violation of the rule which requires a traveler, about to cross a railroad track, to stop, look, and listen, because he held that the evidence showed that where plaintiff stopped the trains could neither be seen nor heard. The rule has been enforced and reiterated in so many cases, from Railroad Co. v. Beale, 73 Pa. 504, 13 Am. Rep. 753, down, that it needs no further discussion. As was said in McNeal v. Railroad Co., 131 Pa. 184, 18 Atl. 1026, experience has confirmed the wisdom of its adoption, and it will not be relaxed or pared down by exceptions. But it is a rule which in its nature is applicable only to clear cases, to those which practically admit of only one view. We are unable to agree with the learned judge that this is such a case. It is true that the place where plaintiff stopped was 100 feet away from the track, and afforded a very short view, about 35 yards to the eastward, and that further view was then cut off, not only by a curve in the track, but by a hotel. But notwithstanding these disadvantages, five witnesses beside the plaintiff, one of them a liveryman, testified that this was the proper and customary stopping place, used by drivers coming in that direction. The witness Ervin explained why this place is preferred, because there is a break or level place in the road, which then runs at a downgrade until so near the track that some horses cannot safely be checked there. Plaintiff and the driver testified that they not only stopped at this point and waited until two trains in opposite directions had passed, but then drove on and 'slackened up' nearer the track, 'to see or hear whether there was anything coming.' In the face of this testimony we do not think that the court could safely say, as a matter of law, that the place where plaintiff stopped was not one which reasonable prudence would sanction for the purpose."

Finding, therefore, no error in the court's action, the judgment is affirmed.